## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

MATTHEW JOHN MITCHELL,

        Plaintiff,

    v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        Defendant.

No. 4:21-cv-40085-TSH

## REPORT AND RECOMMENDATION

August 19, 2022

Hennessy, M.J.

Plaintiff Matthew John Mitchell ("Mitchell") moves for an order vacating Defendant Acting Commissioner of Social Security's decision ("Commissioner" or "Defendant") denying his application for Supplemental Security Income ("SSI") benefits. [Dkt. Nos. 1, 15]. The Commissioner opposes Mitchell's motion and seeks an order affirming her decision denying Mitchell's application. [Dkt. Nos. 11, 17]. District Judge Hillman referred the matter to me on April 12, 2022, for a Report and Recommendation. [Dkt. No. 19].

For the reasons stated below, I hereby RECOMMEND that Mitchell's Motion for Order Reversing the Commissioner's Decision [Dkt. No. 15] be DENIED and Defendant's Motion to Affirm the Decision of the Commissioner [Dkt. No. 17] be GRANTED.

# I.     BACKGROUND

## A.     Procedural History

On March 7, 2019, Mitchell filed an application for SSI, alleging he was disabled as of December 31, 2018.  [Tr. 16].[1]  The application was initially denied on September 4, 2019, and again on reconsideration on November 21, 2019.  [Tr. 93, 106].  Following a hearing held on November 10, 2020 [Tr. 53–82] the administrative law judge ("ALJ") denied Mitchell's application for benefits on November 25, 2020, finding Mitchell was not disabled.  [Tr. 13–30].

On June 4, 2021, the Appeals Council denied Mitchell's request for administrative review, rendering the ALJ's decision final and ripe for judicial review.  [Tr. 1–7].  Mitchell filed a complaint in this Court on August 9, 2021, and the Commissioner answered on November 24, 2021. [Dkt. Nos. 1 and 11].  Pursuant to the Court's procedural order [Dkt. No. 7], Mitchell moved to reverse the decision of the Commissioner on March 7, 2022, and the Commissioner cross-moved to affirm its decision on April 8, 2022.  [Dkt. Nos. 15 and 17].  On April 21, 2022, Mitchell filed a reply to the Commissioner's motion [Dkt. No. 20], and on April 22, 2022, the Commissioner filed a sur-reply.  [Dkt. No. 21].

## B.     Personal History

Mitchell was 51 years old when he claimed disability.  [Tr. 83].  He graduated high school and completed two years of college.  [Tr. 202].  Mitchell states in his Disability Report that he was last employed in December 2018, as a driver's helper at a delivery business, a job he held intermittently since December 2014.  [Tr. 203].  During that time, Mitchell held various other jobs, such as an auto detailer between February and March 2015, and a dishwasher in July 2017.  [Id.].  Mitchell claims he stopped working on December 1, 2018 due to a variety of impairments,

---

[1] Citations to the administrative record are to Transcript page numbers ("Tr."), rather than the page numbers assigned by the Electronic Case Files system.  [See Dkt. No. 12].

including osteoarthritis in the knees, back and hands, hypertension, major depressive disorder ("MDD"), generalized anxiety disorder ("GAD"), and myeloproliferative neoplasms ("MPN"), a form of blood cancer.  [Tr. 201; see also Dkt. Nos. 16 at 1; 18 at 3].  However, Mitchell testified during the hearing before the ALJ that since December 2018, he worked at the carwash between July 2019 and February 2020, and worked on a few painting jobs.  [Tr. 62].

### C.    Medical History

On December 3, 2018, Mitchell presented to Carol M. Mathew, M.D., at UMass Memorial Healthcare for leukocytosis and a complaint of high white blood cell count.  [Tr. 306].  It appears that as part of Mitchell's "work up" with his primary care physician ("PCP")—Ishwara Sharma, M.D.—he was found to have an elevated white blood cell count, so "his PCP wanted him to [be] evaluated by hematology."  [Id.].  Dr. Mathew noted that Mitchell had an "abnormal" complete blood count, "showing leukocytosis, left shifted granulocytic lineage, monocytosis, basophilia as well as polycythemia, and erythrocytosis."  [Tr. 311].  Dr. Mathew also noted that these findings "can be seen in a range of conditions," and need to be confirmed with further evaluations.  [Id.].  On December 7, 2018, Dr. Mathew called Mitchell to discuss scheduling lab work "to check for additional abnormalities," and ordered two additional procedures for Mitchell: a "next generation sequencing" test for possible MPN, and a testing for BCR-ABL.  [Id.].  On December 13, 2018, Mitchell underwent both tests, and was positive for MPN.  [Tr. 315].

On January 7, 2019, Sonali R. Harchandani, M.D., examined Mitchell's test results and found that Mitchell likely had essential thrombocytosis, though he was asymptomatic, and presented "a low risk MPN."  [Tr. 316].  Dr. Harchandani recommended that Mitchell make lifestyle modifications and take a low dose of aspirin to reduce his risk of thrombotic events, and referred Mitchell to "transfusion medicine for consideration of phlebotomy[.]"  [Id.].  Mitchell was

seen by Yong Zhao, M.D., later that same day, on Dr. Harchandani's referral, for evaluation of "management of polycythemia by therapeutic phlebotomy." [Tr. 317]. Dr. Zhao noted that Mitchell "feels well today without any complaints." [Id.]. During his physical examination with Dr. Zhao, Mitchell presented normal strength, sensation, and reflexes, and denied having any headache, dizziness, focal weakness, syncope, seizure, paresthesia or dysesthesia, or any emotional problems, anxiety or depression. [Tr. 318–19]. Dr. Zhao recommended that Mitchell begin therapeutic phlebotomy to manage his MPN and keep hematocrit levels below 42 percent, in order to prevent thrombotic and vascular complications. [Tr. 319]. Mitchell provided "informed consent" to begin this treatment. [Id.].

In follow-up appointments, Mitchell reported continuing to feel well without severe symptoms. During a January 28, 2019, transfusion follow-up, Shi Bai, M.D., noted that Mitchell reported "feel[ing] well today without any complaints." [Tr. 320]. Mitchell "noted some headache next day after phlebotomy, which resolved without any specific treatment." [Id.]. Mitchell reported no fevers, night sweats, weight loss, visual disturbances, tinnitus, hearing loss, ulcers, dental problems, chest pain, respiratory symptoms, gastrointestinal issues, and otherwise no acute abnormalities. [Tr. 321]. A month later, on February 25, 2019, during a "lab review and follow up" for his MPN, Mitchell reported some knee and leg pain, for which he was taking Aleve, but "[o]therwise he [was] doing well" with the phlebotomy. [Tr. 323]. Mitchell reported no other acute abnormalities such as difficulty breathing or uncontrolled pain; his mood was reported as appropriate, and he appeared to be seated comfortably. [Tr. 323–24].

On April 8, 2019, Mitchell presented to Dr. Mathew for an MPN follow-up. [Tr. 328]. Dr. Mathew noted that Mitchell had been undergoing phlebotomy every month to treat his polycythemia, and Mitchell reported tolerating his treatment "fine," though he was "having

frequent headaches that are throbbing, predominantly on the front of the head." [Id.]. Mitchell stated that his vision was worse and he felt fatigued, though his appetite was "fair." [Id.]. Dr. Mathew recommended to Mitchell that he continue with his treatment of aspirin and phlebotomy and "emphasized smoking cessation[.]" [Tr. 332]. Dr. Mathew also prescribed Mitchell hydroxyurea, an oral chemotherapy treatment, and a blood count check in two weeks. [Id.]. Dr. Zhao also saw Mitchell on April 8, 2019, "for further evaluation and management" of his MPN. [Tr. 333]. Dr. Zhao found that Mitchell's hematocrit level was at 47.8 percent, though "the goal [was] to keep [Mitchell's] hematocrit less than 45%." [Tr. 336]. Subsequent to this finding, Mitchell was administered another phlebotomy. [Id.]. Dr. Zhao also found that Mitchell had significant blood pressure difference between his two arms and relayed this information to Dr. Mathew and Dr. Sharma. [Id.]. Dr. Zhao reported that Dr. Sharma said he will contact Mitchell to schedule further evaluation. [Id.].

Mitchell presented to Dr. Sharma's office on April 16, 2019, for consultation regarding the unequal arm pressures. [Tr. 362]. Dr. Sharma was not in the office, but his associate conducted a physical exam and found that Mitchell likely had a left subclavian stenosis. [Tr. 363]. Dr. Sharma's office then made a "[v]ascular referral" to "UMass for intervention consideration," and scheduled Mitchell for a follow-up two weeks later. [Id.]. On April 22, 2019, Mitchell presented to Eric G. Bluemn, M.D., at UMass for evaluation of the unequal bilateral blood pressures. [Tr. 437–38]. Mitchell reported "no symptoms in the left arm" and "never" having "any issues with weakness or cramping[.]" [Tr. 438]. Mitchell also denied "any episodes of lightheadedness or syncope while using his arms." [Id.]. Dr. Bluemn informed Mitchell that this condition was "not dangerous" and would "not need any surgical intervention" unless Mitchell

developed worsening symptoms.  [Tr. 440].  Dr. Bluemn recommended that Mitchell continue blood pressure medication, and "strongly advised tobacco cessation."  [Id.].

On April 29, 2019, during a regular follow-up with Dr. Mathew, Mitchell reported that he felt miserable, dizzy, and his headaches had not let up, possibly because he was "withdrawing from caffeine."  [Tr. 441].  Mitchell further reported that his "anxiety" was "through the roof" and he had not been able to see Dr. Sharma, who was in China.  [Id.].  However, Mitchell stated that he was "tolerating the hydroxyurea well," denied having any "GI [gastrointestinal] upset, nausea, vomiting, [or] diarrhea," and his abdominal tests were normal.  [Tr. 441–42].  Mitchell stated he was having a "hard time financially" because he was "missing work" to attend all his appointments. [Id.].  Dr. Mathew found that Mitchell had an elevated hematocrit of 52, but Mitchell did not have a phlebotomy appointment scheduled until May 20, 2019.  [Tr. 443].  Dr. Mathew "called the blood bank to get [Mitchell] a sooner appointment," but Mitchell refused, stating that he needed "to go to work" and would "take the chance of having a stroke."  [Id.].

The next day, Mitchell presented to Dr. Sharma for his cardiac follow up.  [Tr. 359]. Dr. Sharma's notes indicate that Mitchell was "angry and frustrated" and that the visit was "very challenging[.]"  [Id.].  Despite having told Dr. Mathew just a day earlier that he was "tolerating the hydroxyurea well," Mitchell stated to Dr. Sharma that he "continue[d] to experience side effects from the chemotherapy (meaning hydroxyurea), specifically headaches, but also constipation."  [Id.].

The administrative record indicates that Mitchell's condition steadily improved.  At a May 20, 2019 appointment with Dr. Zhao for "further evaluation and management," Mitchell denied experiencing "adverse effects of therapeutical phlebotomy" and stated that "his headache [was] getting better," so much so that Dr. Zhao deferred Mitchell's next phlebotomy.  [Tr. 445–46].  At

a lab review follow-up at UMass on June 4, 2019, Mitchell reported that he "notice[d] some improvement with his chronic headache," and did not notice any "adverse effects" from the hydroxyurea treatment.  [Tr. 450].  At a follow-up for his MPN with Dr. Mathew on July 15, 2019, Mitchell reported "that he has been doing very well," that "his anxiety [was] much better," and he was "working part-time near Webster so he [was] happy about that."  [Tr. 456].  Mitchell also stated to Dr. Mathew that "his headaches [had] nearly resolved," and he continued to tolerate the hydroxyurea well.  [Id.].  At a follow-up visit with Dr. Sharma on August 23, 2019, Mitchell stated that he "feels reasonably well" with a fair appetite and normal sleep, and denied "any chest pain or shortness of breath[.]"  [Tr. 356].  During a follow-up visit to UMass on September 23, 2019, Mitchell stated he was "doing very well," that his anxiety was "controlled," and his energy level was "fair."  [Tr. 459].  Mitchell reported working "two jobs," one part-time at a carwash and another as a painter.  [Id.].  Mitchell stated that his appetite was "stable," denied any nausea or vomiting, and denied "any concerning headaches."  [Id.].  The physician at UMass found that Mitchell was "tolerating hydroxyurea" chemotherapy treatment "without significant toxicities[.]" [Tr. 461].  At a four-month follow-up with Dr. Sharma on October 28, 2019, Mitchell reported working at a "Gulf Station,"[2] seemed well-nourished and not in any acute distress.  [Tr. 508–09]. Dr. Sharma noted that Mitchell was "Looking for Disability."  [Tr. 508].  At another follow-up at UMass on January 17, 2020, Mitchell once again reported "doing very well" and "eating well," with controlled anxiety, and denied any nausea, vomiting or "having any issues with his energy" as he continued to "remain active."  [Tr. 477].  On April 10, 2020, at a telehealth visit with Dr. Sharma for a "6 month follow up for chronic medication conditions," Mitchell reported "doing reasonably well," denied any chest pain, shortness of breath, nausea or vomiting, and stated that

---

[2] At the hearing before the ALJ on November 10, 2020, Mitchell confirmed this was his job at the carwash.  [Tr. 62].

he was taking hydroxyurea daily and "tolerating [the] medication well[.]"  [Tr. 506].  On July 6, 2020, Mitchell reported to UMass via a telehealth follow-up that he remained "active," got necessary rest, and was "work[ing] with his cousin doing carpentry."  [Tr. 484].  Mitchell denied any headaches, changes in vision, nausea, vomiting, chest pain or shortness of breath.  [Id.].  At a follow-up visit with Dr. Sharma on July 20, 2020, Mitchell reported feeling "reasonably well," denied any chest pain or shortness of breath, had a  "fair" appetite and normal sleep.  [Tr. 503].  At another telehealth follow-up with Dr. Sharma on September 9, 2020, Mitchell reported "feeling reasonably well" "with no acute complaints[.]"  [Tr. 501].

On October 29, 2020, Dr. Sharma completed a treating source statement for Mitchell's physical conditions.  [Tr. 531–34].  This was a year after the visit at which Dr. Sharma noted that Mitchell was "Looking for Disability."  [See Tr. 508].  In his treating source statement, Dr. Sharma stated that he treated Mitchell every four to six months for eight years, and that Mitchell was diagnosed with myelofibrosis and thrombocytosis.  [Tr. 531].  Dr. Sharma opined that Mitchell's relevant diagnosis is "blood cancer," and that because of this condition Mitchell is likely to be "off task" more than 25 percent of a typical workday and can maintain concentration for less than two hours before needing a break.  [Id.].  Dr. Sharma also stated that Mitchell will have to be absent from work more than four days a month, on average.  [Id.].  Dr. Sharma determined that Mitchell can frequently lift and carry items up to twenty pounds, but rarely lift or carry fifty pounds; that Mitchell can sit for four hours per day and stand or walk for three hours per day, requiring the options to sit/stand, lie down or recline throughout the workday; and that Mitchell can frequently reach, handle, finger, feel, push, pull, and use foot controls bilaterally, can frequently climb stairs and ramps, occasionally climb ladders and scaffolds, balance, stoop, kneel, crouch, and rotate his head and neck, but can never crawl.  [Tr. 532–34].  Lastly, Dr. Sharma stated that Mitchell can

frequently move mechanical parts, operate a vehicle, and be exposed to humidity and wetness, can occasionally be exposed to pulmonary irritants and vibrations, and rarely be exposed to unprotected heights and extreme temperatures.  [Tr. 534].  UMass refused to submit a treating source statement, noting in a comment that a "hematology diagnosis shouldn't qualify patient" for benefits.  [Tr. 538–41, 543, 546].

### D.   State Agency Opinions

#### 1.   Physical

Mitchell's medical records were reviewed by Julie Cohen, Ph.D. and Uma O. Chelvan, M.D., in August and September of 2019.  [Tr. 89, 93].  Cohen found that Mitchell's hematological disorders, as well as his osteoarthritis and allied disorders, were "severe."  [Tr. 88].  Dr. Chelvan determined that Mitchell was capable of occasionally lifting or carrying up to twenty pounds and frequently lifting or carrying up to ten pounds; that Mitchell could stand or walk for about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday; that Mitchell could frequently engage in postural maneuvers such as climbing ramps or stairs, balancing, kneeling, crouching or crawling, and occasionally engage in climbing ladders, ropes or scaffolds; that Mitchell had no manipulative, visual, communicative or environmental limitations; that Mitchell's impairments did not limit him to unskilled work; and that he was capable of performing light work.  [Tr. 90–92].  Young Jo, disability adjudicator, determined that Mitchell was not disabled on September 4, 2019.  [Tr. 93].  These findings were reviewed by Linda Margiloff, M.D., on October 24, 2019, and confirmed by disability adjudicator Amber Rudolph on November 21, 2019.  [Tr. 102–06].

### 2. Mental

On August 24, 2019, Mitchell presented to Miriam Kissin, Psy.D., for a consultative psychological evaluation. [Tr. 382–87]. For "Chief Complaint," Dr. Kissin noted that when Mitchell was asked "why he is unable to work," he replied "I am working. I work at a car wash. I work part time." [Tr. 382]. When asked why he works part-time, Mitchell stated, "If I work more, they'll take away my Mass Health. They did it before. I want to work. I have good and bad days." [Id.]. For "Employment History," Mitchell said that he "works three days a week at a car wash," and before that worked "odd jobs." [Tr. 383]. Mitchell stated that, at the time, he was "supported by his income." [Id.]. Mitchell reported he got along with others well but tended to yell when stressed. [Id.]. Mitchell also reported he had depression, stating, "I'd be okay if I was dead," which he attributed, in part, to his diagnosis of blood cancer. [Id.]. However, Mitchell "denied any suicidal thoughts." [Id.]. Mitchell stated that he "smokes marijuana" and "drinks daily, at least a six-pack a night" along with "at least two nips of liquor a day." [Id.]. Dr. Kissin noted that Mitchell's speech was normal, he made good eye contact, was cooperative, adequately groomed and dressed, and that he presented himself appropriately without visible distress. [Tr. 385]. Dr. Kissin found "no notable deficits" in "gross cognitive skills," and diagnosed Mitchell with alcohol dependence and depressive disorder. [Id.].

### E. Hearing Testimony

### 1. Claimant's Testimony

The ALJ held a hearing on November 10, 2020. [Tr. 53]. Mitchell testified that he has received some training in "carpentry" and as a "laborer," but does not have any specialties. [Tr. 60]. Mitchell further testified that after December 31, 2018, he worked at a carwash and did some house painting, deck staining, and power washing. [Tr. 62–63]. In discussing his diagnosed

10

physical conditions, Mitchell testified that his most significant limiting impairment is blood cancer, which results in fatigue that prevents him from performing activities for more than four to six hours per day.  [Tr. 64].  Mitchell testified that he takes oral chemotherapy, blood thinners and anxiety medications, though he does not take medication for psychological issues.  [Tr. 64–66].  Mitchell stated that the most significant impediments to his working full-time were absences and limited hours.  [Tr. 65].  Mitchell further testified that he has no trouble going to the grocery store, though he sometimes struggles with laundry because he has to climb two flights of stairs.  [Tr. 67–68].  In his free time, he enjoys canoeing, which he does on a regular basis.  [Tr. 68].

During examination by his representative, Mitchell testified that he cannot sustain a full eight hours of work per day, and usually naps in the afternoon.  [Tr. 72].  Mitchell further testified that there is usually one day a month, sometimes two, when he will be in bed all day dry-heaving and vomiting, and that since his MPN diagnosis, his sleep has become sporadic.  [Tr. 73–74].  Mitchell stated that he is able to walk, though sometimes his arthritis bothers him.  [Tr. 74].  As for his past employment, Mitchell testified that when he worked in carpentry, he was the "cut man," responsible for cutting wood precisely using "machines with blades."  [Tr. 75].

## 2.  Vocational Expert Testimony

The vocational expert ("VE"), William Slaven, testified that an individual with Mitchell's limitations could perform various jobs in the national economy, including bottling line attendant, assembler of plastic hospital products, or routing clerk.[3]  [Tr. 80].  However, when the ALJ asked the VE whether it would make a difference that "this individual would consistently miss five days of work a month," the VE testified that such an individual would not be able to maintain full-time

---

[3] There is some discussion during the hearing between Mitchell, the ALJ and the VE regarding a job Mitchell held at a liquor store, which he left in 2009 or 2010.  [Tr. 77–79].  The VE classified that job as "retail trade," though it has no bearing on Mitchell's claim of disability nearly a decade later.  [Id.].

employment.  [Tr. 80–81].  The same is true if the individual required frequent unscheduled breaks totaling up to 25 percent of a given workday, or was required to leave work early or arrive late at least once a week.  [Tr. 81].

### F.   Administrative Decision

In assessing Mitchell's request for benefits, the ALJ conducted the familiar five-step sequential evaluation process that determines whether an individual is disabled and thus entitled to benefits.  See 20 C.F.R. § 404.1520; Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6–7 (1st Cir. 1982).

First, the ALJ considered whether Mitchell engaged in "substantial gainful activity" since March 7, 2019, the application date.  [Tr. 18].  The ALJ found that even though Mitchell had worked in various capacities, "his reported earnings" fell "below the threshold amounts that ordinarily show an individual has engaged in substantial gainful activity."  [Id.].  Therefore, the ALJ concluded that Mitchell had not engaged in substantial gainful activity since the application date.  [Id.].  The ALJ noted, however, that Mitchell's "ability to perform these physical jobs," such as "construction worker, landscaper, cleaner and washing cars," on "even a part-time basis appears inconsistent with his allegations of debilitating symptoms and limitations."  [Tr. 18–19].  Second, the ALJ considered whether Mitchell had a medically determinable impairment or combination of impairments that were "severe," concluding that Mitchell suffered from two severe impairments: "myeloproliferative disease and status post tibial fracture."[4]  [Tr. 19].  The ALJ also reviewed the evidence in the record for Mitchell's other impairments—psoriasis, osteoarthritis, episodic headaches, hypertension and hyperlipidemia, substance abuse, depression, and anxiety—and found that none of them were "severe."  [Tr. 19–21].  Third, the ALJ considered whether Mitchell's

---

[4] Mitchell was injured at a construction site in 1998, when he fell 30 feet and fractured his tibia and fibula.  [Tr. 291].

impairments meet, or are medically equivalent to, the severity of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and found that Mitchell did not have such an impairment or combination of impairments.  [Tr. 21].

Fourth, the ALJ reviewed Mitchell's residual functional capacity ("RFC")[5] and past work, finding that Mitchell "has the residual functional capacity to perform light work"[6] with various limitations.  [Tr. 21].  The ALJ examined Mitchell's claim that his ability to work is "limited by osteoarthritis of the knees, back, and hands; hypertension; major depressive disorder; generalized anxiety disorder; and myeloproliferative neoplasms," and concluded that these impairments "could reasonably be expected to cause the alleged symptoms," such as leg and ankle pain, insomnia, and fatigue.  [Tr. 22].  However, the ALJ found that Mitchell's "statements concerning the intensity, persistence and limiting effects" of those conditions "are not entirely consistent with the medical evidence and other evidence in the record[.]"  [Id.].  The ALJ found that "objective evidence" of Mitchell's tibia fracture was "remote history" and "there is little to no mention" of it "in the recent treatment record," so deficits attributable to the fracture and surgeries for it were "mild to moderate in severity."  [Id.].  As for the MPN, the ALJ noted that physical examinations subsequent to December 2018 "show few related functional deficits."  [Tr. 23].  In January 2019, Mitchell "reported feeling well without any complaints," "exhibited normal strength, sensation and reflexes," and in February 2019 he "denied shortness of breath at rest," "uncontrolled pains, or

---

[5] "An individual's RFC is defined as 'the most you can still do despite your limitations.'"  Dias v. Colvin, 52 F. Supp. 3d 270, 278 (D. Mass. 2014) (quoting 20 C.F.R. § 416.945(a)(1)).  "RFC is not a medical assessment, but is instead an administrative finding reserved to the Commissioner."  Ramos v. Barnhart, 119 F. App'x 295, 296 (1st Cir. 2005) (citing 20 C.F.R. § 404.1527(e)).

[6] "Light work" is defined in 20 C.F.R. § 404.1567(b): "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

unstable gait or falls."  [Id.].   The ALJ acknowledged that Mitchell "initiated chemotherapy treatment," but the notes "show similarly intact physical function with few abnormalities[.]"  [Id.]. The ALJ then remarked that at exams in August 2019 (and similarly at exams in January, July, and September 2020), Mitchell "reported feeling reasonably well" and had a "physical examination" that was "largely unremarkable."  [Id.].   "Overall," the ALJ concluded, Mitchell's "allegations of severe functional limitations caused by diffuse physical pain and fatigue are largely unsupported by objective medical findings."  [Id.].   The ALJ then specifically addressed Dr. Sharma's October 2020 functional assessment, stating that "[t]here is no objective support for the severe concentration and persistence deficits indicated by Dr. Sharma," and that "Dr. Sharma's medical opinion is not persuasive as it is unsupported by objective findings and inconsistent with the record as a whole."  [Tr. 23–24].

Fifth, the ALJ determined that Mitchell is unable to perform his past relevant work, but nonetheless could perform other jobs in the national economy.  [Tr. 24–25].  The ALJ stated that even though Mitchell's RFC presents various "additional limitations" that impede his ability to do the full range of light work, the vocational expert testified that even "given all of these factors" Mitchell is "able to perform the requirements" of bottling line attendant, assembler of plastic hospital products, and routing clerk.  [Tr. 25].  Accordingly, the ALJ found that Mitchell was "not disabled," and able to perform "a successful adjustment to other work."  [Id.].

## II.   STANDARD OF REVIEW

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard.

See Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Although the administrative record might support multiple conclusions, the Court must uphold the Commissioner's findings when they are supported by substantial evidence.  See Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991).  The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence.  See Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003).  Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that he is disabled within the meaning of the Social Security Act.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  The plaintiff bears the burden of production and persuasion at steps one through four of the sequential evaluation process.  See id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982).  This includes the burden of establishing her RFC.  See 20 C.F.R. § 404.1512(c).  At step five, the Commissioner has the burden of identifying specific jobs in the national economy that the plaintiff can perform.  See Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

III.   ANALYSIS

Mitchell makes two arguments: first, that the ALJ's RFC determination is unsupported by substantial evidence because the ALJ failed to properly evaluate Dr. Sharma's treating source opinion.  [Dkt. No. 16 at 6–12].  Second (in Mitchell's Reply), that the Commissioner's arguments in her motion to affirm are improper post-hoc rationalizations for the ALJ's decision.  [Dkt. No. 20 at 1].  Neither argument is persuasive.

A.    The ALJ's Determination was Based on
      Substantial Evidence and is Therefore Proper

Mitchell takes issue with the ALJ's rejection of Dr. Sharma's functional assessment for

two reasons.  Mitchell first contends that the ALJ failed to "specify the evidentiary basis for his

RFC determination," and that this was error because the ALJ is required to draw "a logical bridge

from the medical evidence to the RFC."  [Dkt. No. 16 at 8].  This contention is unavailing because

Mitchell misconstrues the ALJ's burden for citing evidence.  "Although the Administrative Law

Judge cannot derive his factual conclusions by ignoring evidence, he is not required to address

every piece of evidence in the record."  Querido v. Barnhart, 344 F. Supp. 2d 236, 245 (D. Mass.

2004) (citations omitted); see also Nutter v. Comm'r of Soc. Sec., No. 20-cv-960-PB, 2021 WL

5122060, at *2 (D.N.H. Nov. 4, 2021) ("The ALJ is not required to mention every piece of

evidence but must provide an 'accurate and logical bridge' between the evidence and his

conclusions." (quotation omitted)).  The regulations require only that the ALJ "provide good

reasons for his decision to give each treating source's opinion the weight he did and these reasons

must be sufficiently specific to make [the analysis] clear to any subsequent reviewer."  Kelley v.

Berryhill, No. 16-12083-DJC, 2018 WL 4323820, at *11 (D. Mass. Sept. 10, 2018) (quotations

omitted).  The Court reads the ALJ's decision as a whole, keeping in mind that "it would be

needless formality to have the ALJ repeat substantially similar factual analyses" at multiple points

of his decision.  Furey v. Saul, 501 F. Supp. 3d 29, 52 (D. Mass. 2020).

The ALJ's decision meets these standards.  In his RFC determination, the ALJ carefully

examined Mitchell's impairments, citing to exhibits from the medical record, before discussing

Dr. Sharma's opinion. [Tr. 21–24].  The ALJ explained that Mitchell had various "unremarkable"

physical examinations where he reported "doing very well," worked some odd jobs since he first

became disabled in December 2018 and provided "no objective indication that he could not meet

the physical demands of a restricted range of light work."  [Tr. 22].  Only then, after having reviewed the extensive medical record, did the ALJ turn to Dr. Sharma's opinion to explain why it was inconsistent with, and found no objective support in, the record as a whole.  [Tr. 22–23]. Among other things, the juxtaposition of the ALJ's recitation of medical evidence with Dr. Sharma's opinion and, in particular, Dr. Sharma's severe restrictions on activities such as sitting, standing and walking, provided a substantial basis for the ALJ's rejection or Dr. Sharma's opinion.  This is a clear logical bridge, consistent with the ALJ's obligation to support his decision with evidence from the record.

Mitchell's second contention is that the ALJ improperly rejected Dr. Sharma's opinion on "concentration and persistence" by focusing on mental, rather than physical, limitations, even though the relevant prompt in Dr. Sharma's functional assessment referred to Mitchell's physical impairments.  [Dkt. No. 16 at 9].  This second argument is also unpersuasive.  To begin, the record squarely undermines Mitchell's contention: the ALJ expressly noted that he was examining the "physical restrictions" Dr. Sharma delineated, finding that though they are "somewhat persuasive and generally consistent with light residual functional capacity," they were far too severe, and therefore "not persuasive" and "unsupported by objective findings and inconsistent with the record as whole."  [Tr. 24].  Further, insofar as Mitchell chooses to ignore the record and interpret the ALJ's assessment of Dr. Sharma's opinion as exclusively focused on mental and not also physical limitations, this would elevate form over substance—the ALJ's determination is supported by substantial evidence in the record, which is the standard this Court must utilize to evaluate the ALJ's findings.  Mitchell reported walking long distances, remaining active, canoeing regularly, and working with his cousin doing carpentry.  [Tr. 75, 312, 473, 477].  He repeatedly denied experiencing pain.  [Tr. 348, 350, 356–57, 364, 367, 369, 455, 501, 503–04, 506, 508–09].  He

consistently reported feeling reasonably well, without adverse reactions to chemotherapy.  [Tr. 312, 317, 348, 367, 369, 484, 501, 503].  While Mitchell did report experiencing headaches on a few occasions [e.g., Tr. 359], he also denied any "concerning headaches" [Tr. 473], uncontrolled pains [Tr. 323], and, on multiple occasions, disclaimed headaches altogether.  [Tr. 477, 501, 504, 506, 508].  Furthermore, Mitchell's testimony at the hearing is inconsistent with the medical record.  Mitchell testified that the primary side effect of the MPN was fatigue, but the record is replete with instances in which Mitchell denies fatigue or low energy levels.  [Tr. 306, 314, 348, 350, 356, 364, 367, 369, 390, 398, 455, 473, 477, 501, 503, 506, 508].  Mitchell testified that one of the side effects of the hydroxyurea was "dysentery [and] vomiting" [Tr. 65], but the record shows he often denied gastrointestinal symptoms, including vomiting, diarrhea or constipation.  [Tr. 306, 314, 335, 348, 356, 367, 369, 390, 398, 407, 415, 448, 501, 503, 506, 508].  In sum, the ALJ's findings rejecting Dr. Sharma's opinion because it is inconsistent with the record as a whole are supported by substantial evidence, and the Court leaves them undisturbed.

### B.   The Commissioner's Arguments are not Post-Hoc Rationalizations

In his Reply, Mitchell argues that the Commissioner justifies the ALJ's decision through post-hoc rationalizations.  [Dkt. No. 20 at 1].  According to Mitchell, the Commissioner made arguments in her motion to affirm that the "ALJ failed to make . . . himself," specifically, that the Commissioner defends the ALJ's rejection of an "attention and concentration" limitation based on Mitchell's mental and physical examination results, while the ALJ only referred to Mitchell's "mental status."  [Id. at 1–2; see also Dkt. No. 18 at 7–8, 10].  Mitchell contends that this is improper because a "reviewing court cannot affirm an agency's decision on the basis of a post-hoc rationalization but must affirm, if at all, on the basis of a rationale actually articulated by the agency decision-maker."  [Dkt. No. 20 at 1 (quoting Casey M.R. v. Kijakazi, No. 20-00453-JDL, 2022

WL 278471, at *4 (D. Me. Jan. 30, 2022))].  The Commissioner responds in her Sur-Reply that Mitchell's position is inaccurate because she does not "advance a rationale for the ALJ's decision that the ALJ, himself, did not articulate."  [Dkt. No. 21 at 2].  Rather, the Commissioner asserts she merely identifies additional evidence in the record supporting the ALJ's existing analysis. [Dkt. No. 21 at 2–3].

The Commissioner has the better argument.  As discussed above, Mitchell's contention that the ALJ rejected Dr. Sharma's opinion based only on "mental status" is misplaced.  Rather, the ALJ found that there was "no objective support"—mental or physical—"for the severe concentration and persistence deficits indicated by Dr. Sharma."  [Tr. 24].  Indeed, the ALJ emphasized that "Dr. Sharma's medical opinion is not persuasive as it is unsupported by objective findings and inconsistent with the record as a whole."  [Id.].  The Commissioner's motion to affirm adopts this identical rationale, that is, that Dr. Sharma's opinion lacked support from either mental or physical examination records.  The Commissioner merely added citations to bolster the ALJ's existing conclusion.  [See e.g., Dkt. No. 18 at 7 ("Substantial evidence supports the ALJ's analysis discounting Dr. Sharma's attention and concentration limitations because they were belied by the lack of abnormal mental status examinations and the general lack of 'objective support' in the record," and citing to mental and physical examination records); 8 ("More broadly, the ALJ cited the lack of 'objective support,' generally, for [attention and concentration] limitations—not simply mental status examinations" and emphasizing that "[t]reatment notes frequently reflect that Plaintiff denied pain symptoms," including many citations to the record); 10 ("The lack of objective findings in the record coupled with [Mitchell's] own presentation at medical appointments stood in stark contrast to the limitations in Dr. Sharma's opinion.").  The Commissioner does not offer a post-hoc rationalization for a rationale the ALJ himself did not

already adopt.  Rather, she argues that the ALJ correctly found that there was "no objective support" for Dr. Sharma's opinion on attention and concentration limitations—based on mental and physical examination records.

## IV.  CONCLUSION

For the foregoing reasons, I hereby RECOMMEND that Mitchell's Motion for Order Reversing the Commissioner's Decision [Dkt. No. 15] be DENIED and Defendant's Motion to Affirm the Decision of the Commissioner [Dkt. No. 17] be GRANTED.[7]

*/s/ David H. Hennessy*
David H. Hennessy
United States Magistrate Judge

---

[7] The Parties are advised that pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2), they are entitled to object to the Court's Report and Recommendation by filing a specific written objection with the Clerk of this Court within fourteen (14) days of service of this Report and Recommendation.  Such written objections must specifically identify the portion of the Report and Recommendation to which objection is made and the basis for those objections.  The Parties are further advised that the First Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) shall preclude further appellate review.  See, e.g., M. v. Falmouth Sch. Dep't, 847 F.3d 19, 26 (1st Cir. 2017); Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988).